1  Dr. Daniel R. Pestana
2  841 Ryan Ct.
   Concord, Ca. 94518
3  (925) 640-3615
   (925) 945-6967
4  danpestana@sbcglobal.net
   Pro Se Plaintiff
5
   FILED
   NOV 19 2015
   SUSAN Y. SOONG
   CLERK, U.S. DISTRICT COURT
   NORTHERN DISTRICT OF CALIFORNIA
   OAKLAND

6
7
8

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

9  **DANIEL R. PESTANA** *individually and*   )
10 *as the natural parent of Lucas Pestana,*   )
                                               )
11                      Plaintiff,             )   **C15- 5294  JSW**
                                               )   Case No.
12                   v.                        )
13 **CALIFORIA STATE COURT SYSTEM** )   **Complaint**
   **SANDRA LUCISH,**                          )
14 **DANA SANTOS**                             )   **Demand For Jury Trial**
   **JEFFREY D. HUFFACKER,**                   )
15 **JOYCE CRAM,**                             )
   **EDWARD G. WEIL,**                         )
16 **DAVID B. FLINN**                          )
17 **HOLY SPIRIT SCHOOL**                      )
   **MARCIE GREENE**                           )
18 **MARY REEL**                               )
19 **SACRAMENTO ARCHDIOCESE**                  )
   **CONCORD POLICE DEPARTMENT**               )
20 **STATE OF CALIFORONIA,**                   )
   **COUNTY OF COSTA CONTRA,**                 )
21 **CITY OF MARTINEZ**                        )
   **MARIAN BODINE**                           )
22 **DR. KATHRYN JEAGER**                      )
23 **DR. ELIZEBETH BRAUNSTIEN**                )
   **DR.  JOHN ROCHIOS**                       )
24 **COURT MEDIATIORS**                        )
   **SUTTERVILLE PRESCHOOL**                   )
25 **KIM TOZAR, Director**                     )
26 **JONATHA N LABA,**                         )
   **CHRISTY WILLS PIERCE,**                   )
27 **DEPUTY PUBLIC DEFENDER**                  )
28                   Defendants,               )
                                               )

1. **Jurisdiction.** This Court has jurisdiction over this complaint because it arises under the laws of the United States.

2. **Venue.** Venue is appropriate in this court because most of the defendants reside in the district, and a substantial amount of the acts and omissions giving rise to this lawsuit occurred in this district.

3. **Intradistrict Assignment.** The lawsuit should be assigned to the Oakland Division of this Court because a substantial amount of the acts and omissions which give rise to this lawsuit occurred in Contra Costa County.

Plaintiff, as and for a Complaint against the above-named Defendants, set forth the following:

### Preliminary Statement

1. The State of California maintains a separate but unequal doctrine of parenting laws in domestic relations matters, which is inherently unconstitutional and fraudulently designed, in part, to exploit children for money generating purposes and for control. Plaintiff states that jurisdiction of the Federal Court is necessary, that state court remedies are inadequate in these circumstances and that Federal questions exist. In fact, California demonstrates an orchestrated effort by its Courts to do as they please; quashing pro-per litigant Fathers. Fearful of a growing backlash from the public against *arbitrary, prejudiced, and even malicious judgments* that are, *allegedly,* protected by judicial immunity, judges have banded together under government sponsorship to devise means of defending themselves, because of their *egregious judgments,* from aggrieved and increasingly militant pro-per litigants. As in this case, judges often are *bold and arrogant* as they know they can get away with just about anything in their judicial acts; even when such acts are in *excess of their jurisdiction and the scope of their employment* and are alleged to have been done *maliciously* or *corruptly.*" **Stump v. Sparkman, 435 U.S. 349, 355-56 (1978).** "*A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction.*"

2. Custodial and non-custodial classifications are mandated in blanket fashion among separated parents to provoke public court contests and a stream of money transfers upon

which to generate government support. Mainstream and irresponsible parents are lumped together under this scheme and arbitrarily forced to prove their *fitness* to the State.

3.  States have huge financial incentives to increase the amount of child support so that it can report it to the Federal Government as "*collected*". To increase collection efforts, the State of California engages in the immoral practice of separating children from their Fathers *via* the Family Court System and awards custody and primary care to Mothers 80%-90% of the time; even when the Father is determined to be and *obviously* just as suitable, or, even a better qualified parent; as in the instant case. This separation policy also works to the financial detriment of Fathers; often impoverishing them, thereby breaking down the strongest financial portion of the family unit.

4.  Child support ordered by the State is largely determined by how much time the child spends with each parent. This means that the State "collects" less child support if parents share equal custody. By prohibiting Fathers from having equal custody and time with their children, the *State's child support coffers are increased and Federal dollars are received.*

5.  The major concern of Fathers is not that they are *unwilling* to pay support or support their children financially; but, the concern is, rather, that they are being *disenfranchised as a Father --- with little or no parental rights.* Children are being largely separated from their Fathers by Family Courts because the State stands to reap a huge financial reward as a result of a Father's loss of custody and primary care. The higher the order of child support, the more money the State collects; even if the amount ordered by the court far exceeds the reasonable needs of the child and notwithstanding the Father's inability to pay --- attempting to escape the threat of contempt and potential incarceration. The truth is that most Fathers don't care about the financial aspects of family court verdicts nearly as much as they care about having time with their children eliminated.

6.  The root of this evil is a State-level addiction to federal tax dollars being doled out as entitlement monies by the Federal Government. In the wake of this horror are millions of children drowning for lack of the care, guidance, and companionship of their Fathers.

7.  Federal bureaucracy creates many of societies ills it claims to be trying to solve by promulgating *largely unconstitutional policies*. There are several steps, incremental steps, that could be taken to restore a child's right to the companionship of both parents. For example, citizens should insist that States abide by the 14th Amendment to the Constitution.

*No Father should be automatically deprived of his fundamental right to the parent his children without due process of law.* Being a male is not a crime. Absent a finding of true danger from a parent, family courts should order shared parenting rights and equal-time-sharing for divorcing parents. These rights are fundamental and *shall not be abridged. The automatic presumption of custody-to-the-Mother is unconstitutional.* Also, *a defacto presumption of custody-to-the-Mother "cannot" be done under color of law. [using false or grossly distorted allegations]*

8. The vulnerability of Pro-Per-Father-litigants to the hostility of judges, court officers and staff toward them ranges from condescending to openly hostile. And, when a Pro Per litigant opposes an attorney, they are often dispatched before having the opportunity to properly present their case. There are a myriad cases within the State of California that exemplify these facts.

9. A "custodial institution of childrearing" has consequently arisen whereby residents and businesses are needlessly brought under state scrutiny, children are placed above their parents against a natural order of childrearing, and gender discrimination is practiced in order to comply with Federal welfare laws found in **Title IV-D of the Social Security Act.**

10. The history of America is brim with examples of the Federal Government denying basic rights to its citizens. Women were denied the right to vote until the women's suffrage movement secured the 19th Amendment to the Constitution. Black Americans also were denied the right to vote and suffered myriad other cruel and humiliating indignities under the law until the civil rights movement brought about desegregation, put an end to Jim Crow legislation and compelled the enactment of the 15th and 24th Amendments to the Constitution. In each of these examples, society was slow to recognize that a problem even existed or that some of our laws were unjust. It took considerable time, concerted effort, self-sacrifice and perhaps even divine providence to realign concurrent societal paradigms with the principles of liberty and justice for all. Thus, here we are fighting for Fathers rights!

11. In the matter at hand, we have Defendant's that that are in the habit of *living in denial. i.e.* failing to admit that doing *wrong* and standing upon *politically acceptable* standards of violating a Fathers rights is just fine! Defendants have erroneously argued at the State level that Plaintiff's claims were without merit and did not rise to the level of granting more

rights to the Plaintiff/Father. Fact is, Plaintiff offered numerous examples that Defendant's claims were without merit, false, grossly exaggerated and/or outright fraudulent. Plaintiff had thoroughly and properly "identified the disputes between the parties" at the trial court level and now seeks relief at the Federal level.

12. The **Doctrine of Standing** serves to identify disputes that are *"appropriately resolved through the judicial process"*. **Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).** To establish standing, Plaintiffs must show that: (1) they "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "there [is] a causal connection between the injury and the conduct complained of"; and (3) "it [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." An interest shared generally with the public at large in the proper application of the Constitution and laws will not do. "The party invoking Federal jurisdiction bears the burden of establishing" the elements of standing."

13. In the matter at hand, Plaintiff has (1) in fact "suffered an injury" — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical". Plaintiff has been *disenfranchised as a Father* with all Constitutionally protected rights given 100% to the Defendant/Mother for no good reason. The Defendant/Judge and other Defendants willfully and purposefully enabled Plaintiff's rights to be violated with vague and erroneous statements and resulting orders, even though Defendant's were overtly informed by Plaintiff of anticipated consequences. (2) "there [is] a causal connection between the injury and the conduct complained of". In this case, Plaintiff was a participant in every facet of the pregnancy and birth until Plaintiff's rights were removed by Defendant's *joint* efforts. There is a definite connection between the resulting denial of rights and access by Plaintiff with his son [*injury*] and the orders of the court with participation by Defendant's [*casual connections*], and (3) the injury will be redressed by a favorable decision from this court reinstating Plaintiff's rights.

14. At the State level, Defendant's have used affirmative defenses, sharp angling, lies and gross distortions insisting Plaintiff's case had "no merit!" In fact, Plaintiff gave very specific examples; however, notwithstanding said examples, he was erroneously portrayed as frivolous and irrational. At this stage, Plaintiff need not set forth evidence with all specific facts, **Lujan, 504 U.S. at 561**, but needs only to provide general factual allegations that are plausible. With this standard in mind, Plaintiff's allegations of injury in fact and causation are within the realm of factual plausibility and sufficient to establish

standing at this stage of the litigation. Plaintiff must be allowed to continue through discovery to develop his case.

15. Also, courts have recognized that the *present*, detrimental effects upon Plaintiff of a future *contingent* liability can *also* constitute an injury in fact. **Lac Du Flambeau Band of Lake Superior v. Norton, 422 F.3d 490, 498 (7th Cir. 2005)** In this matter, the present impact upon Plaintiff of a future though uncertain harm establishes "injury in fact" for standing purposes. **Jones v. Gale, 470 F.3d 1261, 1267 (8th Cir. 2006)**

16. As relevant herein, the named Defendants have committed the Plaintiff parent, and child indefinitely to a custodial institution in violation of a full range of inalienable rights protected by the United States Constitution without a compelling, important or rational basis.

## Parties

17. Plaintiff, Daniel R. Pestana, hereinafter referred to as the "Father", is the natural parent of Lucas Pestana, with a residence located at 841 Ryan Ct., Concord, CA 94518. Until the time of his court challenges to his Constitutionally protected parental rights, he was gainfully employed where he derived income for childrearing purposes and a good husband and Father.

18. Plaintiff's child, Lucas Pestana, was born to the Father, having thereby established a unique and unbroken genetic bond with him that originates from time immemorial. The Father has nurtured and enhanced this bond to the present day notwithstanding the efforts of the Defendants to extinguish that bond.

19. Defendant, California State Court System, is the branch of State government which has assumed control over all child found subjects in its wide ranging jurisdiction, as relevant to this complaint.

20. Defendant, State of California, has established a socialist form of government which controls every manner of activity enjoyed by the people in violation of the State and Federal constitutions. As relevant to this Complaint, it features a multi-tiered court system in Family matters designed to conform to **Title IV-D of the Social Security Act.**

21. Defendant, Jeffrey D. Huffaker, Joyce Cram, and Edward G. Weil, David B. Flinn are persons acting under color of State law by coercing the Plaintiff/Father, under threat of incarceration and intimidation to accept reduced parental rights which harm Father/Son relations. They are, or were, Court Judges for the County of Contra Costa and members of the Superior Court of California Court System and were accorded initial jurisdiction

over the divorce actions filed and subsequent Court actions that followed. As relevant to this Complaint, they personally damaged successfully performed childrearing agreements without lawful authority, substituting their personal judgments for those of the natural parents. Defendants Jeffrey D. Huffaker, Joyce Cram, Edward G. Weil and David B. Flinn have threatened and thereby caused emotional abuse by threatening the Plaintiff/Father. They have also helped in preventing and denying communication and visitation between Plaintiff and son.

22. Defendant, Sandra Lucish, hereinafter "Mother", is the natural Mother of Plaintiff's child and at present time residing in Sacramento, California, 90 miles from Lucas's birth place. As relevant to this Complaint she continues her attempts to destroy the Father's relationship with his son, Lucas. Defendant Mother has threatened and thereby caused emotional abuse by threatening Plaintiff. She has also helped in preventing and denying communication and visitation with Plaintiff and his son. Defendant Lucish demonstrated that she, once again, will not follow the court orders and abide by California law dictating *continuing contact. e.g.* The Mother places the parties' son, Lucas, in clothes with the wrong last name on the back of them during school events; placing her maiden name, Lusich, on them. Defendant Lusich knows for a fact the Plaintiff will be present at these events since they are during his court ordered visitation times. Defendant Lusich also filed two motions in 2009 with the court objecting to Commissioner Huffaker's custody order and Dr. Jeager's 730 evaluation. She would not agree to an equitable visitation schedule and would rather have Lucas with a non-English speaking nanny than with his Father. In fact, Lucas was with the nanny more during his waking hours then he was with his Mother. Further, in 2014, Defendant Lusich objected to the mediator giving Plaintiff 44 days of summer vacation and Defendant Lusich wanted to give Plaintiff 42 days. She argued against the mediator's recommendation of two weeks with Dad and one week with the Mother during summer vacations due to fabricated (penial code: 118-131) money issues of Father and that Lucas could not attend Sacramento summer camps near Mother's home. Further, to keep Plaintiff's visitation time minimal, Defendant Lucish claims she can telecommute when California attorneys cannot telecommute by judicial regulatory rules. These lies, and others outlined herein have been perpetrated by Defendant Lusich to disparage Plaintiff's character and to gain unfair custodial control

the Lucas.

23. Defendant, County of Contra Costa, is a municipal corporation duly organized under the laws of the State of California with a principal place of business located in the City of Martinez, CA. As relevant to this Complaint, it relies upon revenues secured through unconstitutional policies and practices exemplified by this case.

24. Defendant, Dana Santos, Defendant Lusich's [*The Mother*] attorney, aided and abetted in Mother's felonies in the 2012 school trial [*filing false instruments in violation of penal codes 112-117, PERJURY penal codes 118-131*] that resulted in Plaintiff losing that trial and suffering $25,000.00 in sanctions. It also caused Plaintiff to suffer through more litigations and monetary lose. In doing these acts of moral turpitude, the Mother has violated her own codes of professional conduct as a legal professional and continues to perpetuate the conflict with her MISLEADING MATERIAL STATEMENTS [penial codes653.55-653.61] per the November 26, 2014 per trial court transcript regarding sports camps [*found at page 11 lines 22-28 and at page 12 lines 1-10*] slandering and trying to prejudice Judge Edward G. Wiel against Plaintiff on the fabricated Holy Spirit tuition demand letter stating, in part, that "*if I had a good faith belief that he would follow through on that, I would be pitching this to my client.*" The school registration forms show Plaintiff has no contractual obligation to Holy Spirit School.

25. Defendant Marian Bodine was Plaintiff's school expert, yet she did not, properly assess the schools in 2012 as contracted by Plaintiff and ignored his repeated contacts and pleas for her to live up to her contractual agreement.

26. As to Defendant's Holy Spirit School, Principle Marcie Greene, Bookkeeper Mary Reel and the Sacramento Archdiocese, said Defendants all conspired to extort money from Plaintiff and committed fraud by giving the Mother, Defendant Lucish the fabricated tuition demand letter which she submitted the day of the contempt trial against Plaintiff; all 3 are felonies in the State of California. The Holy Spirit staff and ultimately Defendant Lucish threatened Plaintiff by saying that that my son Lucas would be suspended from school. This was not true. They tried to coerce Plaintiff to let them have access to Plaintiff's bank accounts and made tortious claims that they had been "lenient regarding this matter". Yet, the registration forms show that Plaintiff has no contractual obligation to Holy Spirit and Lucish, a high ranking California State attorney knew this. She was

the one who signed the registration contracts with Holy Spirit. Further, Defendant Lucish still submitted this fraudulent letter as an exhibit the day of trial to try and convict Plaintiff of contempt and rob Plaintiff of his freedom. As a result Judge Flinn was going to put Plaintiff in jail for 5 days for a first offence and one count of contempt. The conspiracy is shown by the hand written note on a registration form that the invoices should be sent to Plaintiff. Plaintiff had to request on two different occasions for Lucas's **complete** school record and the first time they omitted the registration forms and the second time none of the three registration forms have Plaintiff's name/signature. Plaintiff, still, has not received the demand letters that should be part of Lucas's school record nor totally complete registration forms.

27. As to Defendant, the Concord, California Police Department, the last time Mother assaulted Plaintiff, on 8-13-13, Defendant Lucish lacerated Plaintiff's right ear, the pictures show blood, diagnosed by Plaintiff's Doctor with a concussion and characterized the assault as petty and refused to arrest her when Plaintiff asked them to do so. In fact, Defendant Lucish assaulted Plaintiff 3 times in the presence of Lucas and actively engaged in parental alienation to the point where Lucas, at ages 4, 5, 6, 7 told his Father [*Plaintiff*] that he hates him and wishes he was not his Dad and wishes he was in jail.

28. Dr. Katherine Jeager, the 730 custody evaluator, confirmed that Mother assaulted Plaintiff in the "nanny cam" video within her report to Commissioner Huffaker. Yet, she condoned the physical violence that occurred in the presence of Plaintiff's son, Lucas, with her final recommendations. She made gross misrepresentations of the individual sessions portraying me in a negative manner. Her testing protocols violated the legal parameters of a 730 evaluation as well as her professions. Dr. Jeager ignored and omitted from her report and recommendations to Commissioner Huffaker that the Mother uses her childhood security blanket in her 30's and 40's. She also omitted that Mother's custody proposal suggested that Plaintiff only gets to see Lucas 7% to 15% in Sacramento County only until high school age, even though the Mother moved Lucas almost 100 miles from his Plaintiff/Father and place of birth without Plaintiff's consent nor agreement and the fact that Plaintiff and Lucas have a large extended family near Lucas's place of birth.

29. Dr. Braunstien assigned as a co-parenting counselor acted opposite. Stated that Plaintiff would not get 50/50 custody of Lucas. When Plaintiff asked her to educate the Mother on the commonly prescribed to psychological views of childhood behavior for her profession she would not and acted as if she did not know them. She went so far as to fabricate goings on in Plaintiff's group sessions and report them to the 730 custody evaluator (Dr. Katherine Jeager), that portrayed Plaintiff in a negative light, which Dr. Jeager conveniently and slanderously placed into her final report to Commissioner Huffaker.

30. Dr. Roichos, the court ordered "conflict resolution" mental health professional that Plaintiff was forced to visit/endure for one year at an amount of $150.00 per 50 minute session, made suggestions that would only cause more conflict between Mother and Father. Something he was ordered by the court to try and decrease. For example, he suggested that each time the Mother was late for a pick up that Plaintiff and Lucas should go to one of the neighbors and make mother wait a significant amount of time. This action was intended to try and curb Mother's chronic tardiness of the transitions of Lucas from one parent to the other. Dr. Roichos lied to Plaintiff at an initial session, when Plaintiff asked if he knew Dr. Elisabeth Braunstien, the co-parenting counselor. At a subsequent session when pushed on the issue he admitted he knew her and that she referred him fathers that were trouble makers.

31. Judge David B. Flinn, in a contempt of court trial for the sanctions levied on Plaintiff by Judge Joyce Cram, brought by Mother and Dana Santos was heard in January of 2015, he allowed Mother to enter into evidence 15 exhibits on the first day of this trial. And, after several objections by the Contra Costa County Public defender, who was representing Plaintiff, Judge David B. Flinn removed 4 of those exhibits. Leaving 11 still entered in as evidence against Plaintiff. Father's Public Defender nor Plaintiff saw these exhibits prior to the trial. Judge David B. Flinn, presiding over this family law contempt trial, was informed that this was a violation of Plaintiff's discovery rights. He allowed them anyway. Judge David B. Flinn demonstrated his gender discrimination against Plaintiff only minutes into the first day of trial by announcing to the Public Defender that he is prejudice against attorney's clients when "they try and game the system". The Public Defender was only trying to protect Plaintiff's constitutional rights which Judge

David B. Flinn ultimately violated. With the illegally submitted evidence Judge David B. Flinn found father guilty of contempt of court of the Judge Joyce Cram sanctions order. Sentenced Father to 5 days in jail for a first time misdemeanor offence. The Public Defender quickly argued that this was too harsh and he changed the sentence to 40 hours of community service. Second Harvest food bank was chosen as one of the court approved places of service. Judge David B. Flinn announced he was familiar with this food bank. This food bank only lets people who have court mandated community service help during the hours of 9 am to 12 pm Monday through Friday. This is right in the middle of Plaintiff's work day, which was brought to his attention during witness testimony. Not only was Plaintiff's freedom jeopardized but his ability to earn a living and pay child support and the $25,000.00 in sanctions were jeopardized as well. The Mother committed multiple felonies once again, for example stating that she did not receive any money for the sanction, yet Plaintiff produced the canceled money orders from the United States Postal Service. These showed the Mother's signature on the back endorsing them and depositing them into her bank account. She also made false and misleading statements and evidence that was submitted as trial exhibits. The Public Defender also brought to Judge David B. Flinn's attention and he, once again, protected his colleague; a female high-ranking California State official---violating his Judicial Ethics Cannons.

32. Defendant, Sutterville Preschool and Director Kim Tozar refused multiple requests to produce Lucas's school record forcing Plaintiff to have to subpoena them. When Plaintiff finally received them there were no scholastic tests in them and the attendance records had been falsified. In fact, the attendance records show that Lucas was at this Sacramento preschool no less than 6 times when in fact he was 100 miles away in concord in Plaintiff 's care. The Mother was involved with these felonies, her signature on these falsified records match other documents that will confirm this. Letters were submitted to Judge Joyce Cram that Lucas was attending 2-4 days a week at Sutterville yet his registration forms that were submitted to Judge Joyce Cram show 1 day a week. (penial code 470-483,132-141,182-185,118-131,186-186.12, *inter alia*)

33. Defendant Jonathan Laba, is the supervising attorney of the Public Defenders office, Jonathan Laba and Defendant Christy Wills Pierce is the deputy public defender.

Defendant Jonathan Laba was responsible for Defendant Pierce's action.

34. Defendant Pierce only reviewed Plaintiff's case in 20 minutes prior to the hearing on January 9, 2015 and at no other time before this. Defendant Pierce should have filed a code 170 to remove Judge David B. Flinn on January 7, 2015 before the January 9, 2015 sentencing hearing. This was because Defendant Flinn announced his bias against her for "*gaming the system.*" This would have protected my 5th amendment and other rights and it was obvious the Defendant Flinn followed through with his bias by disallowing 15 exhibits in as evidence the day of trial. Defendant Pierce was well aware that the judge was acting in a biased fashion, relaying to Defendant that the Judge could not allow said exhibits.

35. Defendant Pierce told Plaintiff that he should not have asked for the transcripts of the hearing while Judge Flinn was in the court room chatting with the bailiff and the court clerk....this makes the judges mad, they will think you will fight their decision". This proved to be extremely bad advise and demonstrate that she was not working in Plaintiff's best interests.

36. Defendant Pierce also allowed hearsay testimony from the Mother to go on and allowed the Mother to perjure herself, as well, about not receiving any payments for the sanctions. Defendant Pierce allowed this to go unchecked even when she showed Judge Flinn the money orders for sanctions signed by the Mother. [a *code 170 should have been filed*]

37. Defendant Pierce only needed a violation of the Judicial Ethics Canons violations to file a compliant, yet, she did not! She did complain to Plaintiff about Judge Crams past actions in the mistreatment of other Fathers. If Defendant Pierce had "vigorously" represented her past clients and filed Judicial Council complaints then Plaintiff may not have had to deal with Cram and/or Flinn. Defendant Pierce refused to file a Judicial Council complaint yet she admitted Judge Flinn violated Plaintiff's due process rights.

38. This action is brought, in part, pursuant to **42 U.S.C. Sections 1983, 1985, 1986 and the First, Fourth, Fifth, Eighth, Ninth, Tenth, Thirteenth and Fourteenth Amendments** to the United States Constitution to redress the deprivation of rights secured to the plaintiffs. Jurisdiction of this Court is founded upon **28 U.S.C. Sections 1331, 1361, 1367(a), 2201 and 2202.**

39. Jurisdiction and pendent claims are further supported by **Title IV-D of the Social**

**Security Act** generally, and **42 U.S.C. Section 652(a)(8)** specifically. The State of California is engaged in the use of Federal District courts and will continue to do so here in the parenting of children found within the State for revenue generating purposes.

### Background

40. The parties, Daniel R Pestana and Sandra Lucish forged an intimate partnership for the purpose of creating a child and family. This objective was achieved, in part when their first child, Lucas Pestana, was conceived.

41. Lucas was ultimately born of this partnership through a natural process that infused co-equal genetic traits uniquely within Lucas. Such traits are, and remain, most cognizable to the parents charged with a duty and right to rear their own child.

42. The Father participated in successive birthing processes to the extent of his natural capacity. Among other things, he engaged in, and assisted with, intimate decisions, birthing classes sonogram viewings, exigent home confinement, the delivery processes, lactation appointments and the continued support and nurturing of Lucas since his birth.

43. During 2008, the parents commenced a residential separation; however, they agreed to share their child on an amicable basis for parenting time, decision-making and the presumption was that the Mother and Father would continue to equally parent their son as they had been since Lucas's birth.

44. Subsequently, the Mother went back on her parenting agreements and sought to limit Plaintiff's rights with his son. She attempted to reduce the Plaintiff/Father's agreed upon co-parenting rights; all of which was alien to the parties previous parenting philosophy and pattern of behavior.

45. During the 2009 trial a domestic violence charge against the Mother, which was caught on a nanny camera system was completely ignored by Commissioner Jeffery Huffacker who was the judge for the trial. Commissioner Huffaker refused to let one of Plaintiff's witnesses testify, and cut short Plaintiff's psychological expert; thus, not allowing Plaintiff to present his case in its entirety --- violating Plaintiff's due process rights. Commissioner Huffaker condoned, aided and abetted in Mother's felonies of false statements and perjury, when he did nothing about her claiming that Plaintiff filed a false police report of domestic violence (Dr. Jeager, the 730 custody evaluator confirmed for Commissioner Huffaker that "mother did hit/push father"), he went so far

as to make me visit Lucas in Mother's home every Thursday for a year, making Plaintiff fear for his safety and causing him undue mental torture, among others that are too numerous to list here. Instead he rewarded the Mother, a high ranking state official by giving her primary custody of the parties' son, Lucas, and letting her move Lucas almost a 100 miles away from his Father and place of birth, he violated the 50/50 legal designation, giving Mother sole responsibility of school choice and would not give Plaintiff any school holiday vacation or summer vacation time. As the trials have gone on Commissioner Huffaker has heard evidence that Lucas was with his foreign national nanny from Guatemala more during his waking hours than he was with Mother yet not letting Plaintiff have substantially more time with his son. Commissioner Huffaker knew from the Mother's own filed motions that she would not abide by California code that custody should go to the parent who has demonstrated that they will provided constant and continued contact with the other parent. Mother filed two separate motions objecting to Commissioner Huffaker's custody order as well as objecting to Dr. Jeager's 730 custody evaluation that Mother asked for.

46. Even more disturbing are the activities of the Mothers' attorney, Andrew Ross, who held a party the last day of the trial for Commissioner Huffacker. At this party the Mother's Attorney, Andrew Ross put his arm around Commissioner Huffacker and announced to Plaintiff's attorney, Bob Erich that he and the Commissioner were going into his office and they were going to decide the outcome of the trial; which was still not complete. Andrew Ross stated you will hear the opinion on Monday. The two went behind closed doors and thirty minutes later Commissioner Huffacker and attorney Ross came out with Commissioner Huffacker telling Plaintiff's attorney Bob Erich that "Ross was joking." Plaintiff's attorney Bob Erich would not file a *170 motion* as it would be a waste of time because Commissioner Huffacker would be the one to review it and it would never reach the Bar Association as a complaint. Less than 6 months later attorney Bob Erich won the biggest monetary case of his career in Commissioner Huffacker's court.

47. It is also important this Court should know that Commissioner Huffacker had to recuse himself from several cases during the time frame of Plaintiff's case due to his leukemia treatments (*confirmed by plaintiff's physician who had his divorce at the same time*). A Commissioner of unsound mind should have recused himself from ***all*** cases.

Commissioner Huffacker ended up passing away while still on the bench and his decisions that many be heard from the gallery were very strange. He ignored case law and statute in ruling on Father's case and when it was brought to his attention and the fact that he could rectify his wrong doing, he refused. For example, during a temporary custody hearing, he placed an approximately 10-year old boy with his Mother who was living in a drug rehabilitation facility. In another instance he made the transition of a 6 month old infant in the parking lot of a local McDonalds parking lot, both parents had domestic violence restraining orders on each other. *Inter alia.*

48. Moving forward, the parties' child is academically behind and now is going into the second grade. At trial in November 2012 for school location and visitation, evidence was presented. The mother tested Lucas for Kindergarten at Holy Spirit school in April 2012. His results were marginal, approximately in the 16th percentile. Lucas is unable go to the Mothers' proposed Kindergarten. Also presented, in August of 2012, was a test from Sutterville preschool, where Lucas was going to 1 day a week with results marked as "excellent," and ready for Kindergarten. The ***test dates where less than four months apart***. Yet Defendant Mother enrolled Lucas in a preschool class at Sacramento public school, not Kindergarten. The Defendant Mother and the preschool director, Kim Tozar, falsified Lucas attendance records. This was verified by a private investigator. For example, Lucas was signed in on days that he was 100 miles away in Plaintiff's care, no less than 6 times. All the above and more were considered "irrelevant" by Judge Joyce Cram, and went so far as to grant a continuance to Mother to enter this falsified test from Sutterville. Judge Joyce Cram herself was a school teacher at one point in her life.

49. Plaintiff had Lucas tested at Sylvan Learning Center in November 2012, wherein results indicated the child was in 37th percentile for language. Judge Joyce Cram ignored this and all other evidence presented by Plaintiff.

50. Judge Joyce Cram was also informed of the Mother's committed felonies regarding school entrance testing and attendance records. Violation of **Penal Codes 470-483,653,112-117,186,132-141,118-131,182-185.** Judge Joyce Cram stated this information is "irrelevant" and her court was not a free for all. However, by Judge Joyce Cram violating her Judicial Ethics Cannons, by not conducting as investigation on these serious and egregious acts by a high ranking female California State attorney and a

family law specialist attorney, is exactly what she has made our court system. Forgery, misrepresenting the facts, providing false evidence and statements under oath, and committing perjury were all completely ignored by Judge Joyce Cram in favor of the Mother and deemed irrelevant! Also, Judge Joyce Cram violated California code that mandates that all parties involved in child custody litigation must attend a mandatory mediation session and a report from said mediation is then given to the Judge overseeing the case. This mediation could have protected Lucas and Father from needless harm and $25,000.00 in sanctions handed down by Judge Joyce Cram.

51. Judge Joyce Cram determine the best school for the parties' child would be that of the Mother's choice and, concurrently, changed the visitation of the Plaintiff/Father. Judge Joyce Cram's decision did not fit the criteria of *best interest*; however, she changed the criteria three different times during the proceedings; seemingly to suit the *whims* of the Mother. Judge Joyce Cram's judgment is called into question.  She announced in Plaintiff's case that Commissioner Huffaker made a sound and well thought out custody order for Lucas and Father, even though she knew our case very well and that Mother had conducted domestic violence against father while mother was holding our 4 month old son. Also, Commissioner Huffaker's custody order would not give Plaintiff any summer vacation or school holiday vacation for the next 13 years. She stated that Plaintiff's motion was a *"thinly vailed attempt to change custody"*. Nowhere in any of the legal documents presented to her was there any mention of a change in custody. This was a visitation change. She violated Plaintiff's due process rights by acknowledging and ignoring the 170 motion (filed by Algera Tucker, Plaintiff's attorney who refused to show up the second day of trial) to recuse herself from Plaintiff's case for her prejudicial behaviors, rulings and violations of California code.

52. Also, Plaintiff's attorney would not attend the second day of the 2012 trial and had not scheduled the school expert to observe the schools in question, and Judge Joyce Cram refused to let Plaintiff's expert testify on any aspects of the case. Judge Joyce Cram made Plaintiff continue with trial on his own; ill prepared and would not allow for a continuance, even though she granted Mother a continuance in August 2012 to get into evidence the falsified "excellent" Sutterville preschool academic test.

53. Further, Judge Cram sanctioned Plaintiff $25,000.00 for not knowing the rules and

procedures; holding him to the same standards of an attorney and for filing a motion for Lucas to attend an appropriate school to aid him in his developmentally challenged language skills that were diagnosed at age 2 and that Defendant Lusich acknowledged in open court in 2010. Judge Joyce Cram wanted to punish Plaintiff for what she claimed was a "thinly vailed attempt to change custody" even though the above evidence was provided to her. She also stated that Plaintiff *"needed to get used to the custody order"*. The current order did not allow Plaintiff to see his son during any school holiday/summer vacation nor time off for the next 13 years; all of which was what Plaintiff was asking to correct --- to begin with. Judge Cram stated that this was a thinly vailed attempt to change custody by the Father. This was a trial that would determine what would be the best school and school parent for Lucas which would have ultimately had a "change in visitation" not custody element to it. How could any parent get used to an order that was harming their child, harming the bond between a child and a parent. A child who was academically developmentally behind, even more so due to the fact that the problem was diagnosed by a pedestrian at age 2 years old and that Mother admitted to knowing. Again, prejudicial treatment against Plaintiff and in favor of the Mother for no good reason.

54. Further the Court should know that the Defendant/Mother has assaulted Plaintiff on three separate occasions in the presence of the parties' minor child resulting in Plaintiff receiving a concussion during the last occurrence. During that trial Commissioner Huffacker stated that Plaintiff *"should have given her, her space."* When more of this evidence was presented in front of Judge Edward G. Weil it was also ignored as it apparently is ok for a high ranking white female state attorney to commit domestic violence and not worry about consequences. We see more concern by the National Football League on these issues. Plaintiff has equal protection under the law but the Defendants, under color of law, have stolen this from Plaintiff and in the process have abused their positions of power.

55. In 2014 Judge Edward G. Weil, during and ex-parte motion, dismissed Plaintiff's motion for a trial to increased parental time stating since Plaintiff already has 20% of the time, at present, it is not the best interest criteria. However, Judge Edward G. Weil did send the parties' to mediation for holiday and summer vacation time to be discussed. He stated that this *may* get Plaintiff back to 35-42% custody. Judge Weil also completely neglected

the fact that the parties' son, Lucas, **was tested in June 2014 and needed 100 hours of reading tutoring and Lucas was tested at Sylvan Learning Center again in June of 2015 and needs 100 hours of reading tutoring and 40 hours of math tutoring.** Lucas' *educational needs* were brought to the attention of Judge Weil by Plaintiff; however, Plaintiff was ignored. Now, Lucas is paying the price. Per the trial court hearing transcripts [*November 26, 2014 hearing transcripts*], the Mother was more concerned about Lucas being in multiple *fun/sport* summer camps than spending more time with his Father who has been working with Lucas' reading and Mother doesn't consider educational camps *enriching.* Further, Defendant Weil threatened to take time away or change the mediator's proposal if he didn't like the kinds of activities Plaintiff placed Lucas in during his custodial parenting time. Plaintiff remained concerned about what would happen if he didn't place Lucas in any activities and just concentrated on Father/Son time. Judge Weil threatened Plaintiff outside the scope of his authority by stating, in part that "I will note, Mr. Pestana.....this is what you've told me you were interested in doing." *"If it gets back to me later that nothing like that happened and the child was not in good activities, then I'm going to consider that going forward in what we do." "Okay. That is all I'm going to say about that."* Further, Defendant Weil made several contradictions in his orders. In the trial transcript at page 5 line 19] Defendant Weil states *"we have to do something to try to encourage that continuing relationship and part of what I'm seeing here is that things—the more things get centered around where mother lives, the more that becomes a justification for more time with the Mother... and it continues to encroach on trying to give time to Father to an extent that, you know, I get worried about maintaining the relationship....because we really see Mom's house is the place where Lucas lives."* Defendant Weil makes this kind of comment yet ignores the evidence exhibits properly given to him under court rules of parental alienation, 3 assaults in front of the child and the mental illness of Mother using a security blanket. On the same day the parties' case was heard another case went before ours and Judge Edward G. Weil ruled that a Father should not be the school parent because he was living with his girlfriend and was not sure how stable that was and gave the mother the school parent custody. Yet mother's home was in a short sale and mother was moving the little girl to a completely new school and town. The old school and

child's extracurricular activities were near Dad's home. Judge Edward G. Weil had the court filing clerk change Plaintiff's filings of this evidence from filed (on the correct day) to received and these were handed to be by the bailiff prior to the Judge dismissing Plaintiff's case during an ex-parte hearing. The tampering of an official court file cannot go unchecked and condoned. Judge Edward G. Weil had three criteria to choose from to protect Lucas and Father; best interests of the child, change of circumstance, and a broad discretionary judicially derived change of circumstance. He failed with all three criteria. Defendant Weil acted with passion and prejudice.

56. The mediators, in the matter at hand, violated their "Model Standards of Conduct for mediators." They violated Plaintiff's rights, on more than one occasion, to be protected from a violent parent even though they were informed in the mediation registration forms that Plaintiff had been assaulted; yet, they made the parties leave the building at the same time. The rules  clearly state that Plaintiff should have been able to leave prior to Defendant Lucish especially when her 6'5" 400 pound brother in law has threatened Plaintiff's life and intimidated him by saying he was the Constant Gardener at one of the transitions that Defendant Lucish brought him to. [*This is a movie where a Doctor is murdered*] Further, the mediators announced that they would not review the evidence that Plaintiff provided to the mediation meetings; however, the first mediator actually tried to reenact the D.V. in the nanny cam video saying it was self defense

57. As a result of the nefarious and deleterious activities of the above-named Defendant's, Plaintiff has filed this Federal Court action.

## FIRST CAUSE OF ACTION

(Substantive Due Process)

58. Plaintiff repeat and re-allege all of the paragraphs of this pleading against all Defendants in the federal causes of action that follow under a conspiracy and joint enterprise theory of liability and are incorporated into pendent state claims on the element of damages.

59. Government seizures of child, homesteads, mobility, livelihoods and precious human rights protected by the American Constitution for money generating purposes is conduct which "*shocks the conscience*" of a free society in a modern day world.

60. The State of California and assisting Defendants have effectively seized the child, home and livelihood of the Plaintiff/Father without fair showing of abandonment, neglect,

abuse, unfitness, misconduct or legitimate cause and without just compensation.

61. Over multiple years and trials, Defendants have engaged in acts of psychological torture through fraud and the exploitation of an innocent child. They systematically destroyed productive parent-child bonds that required no state intervention and compelled the victim Father and his child to pay for the processes that produced the damage left behind.

62. Lucas has been deprived of his inherent natural right to have a participating Father in his life, unimpaired by utopian parenting philosophies and the state's "custodial institution of childrearing". Since the Plaintiff's separation from the Defendant/Mother, Plaintiff has become a pawn in needless and arbitrary "custody" and "support" battles which have caused serious internal and developmental harm.

63. By reason of the foregoing, plaintiff is entitled to an award of compensatory damages in the amount of Two Million Dollars ($2,000,000.00), an award of punitive damages in an amount to be determined by the court, costs and fees pursuant to **42 USC section 1988** and the costs of prosecuting this action. Declaratory and injunctive relief are also sought to remedy long neglected discriminatory practices and increasingly fraudulent conduct of government actors purporting to act in the "best interests" of the "people's child".

## SECOND CAUSE OF ACTION

(Procedural Due Process)

64. Unrestrained expansion of state power into private and sensitive matters of childrearing has perverted the constitutional character of the people's judicial branch of government. Pay raise litigation, federal incentive funding, and child support interest revenues have burdened courts beyond their declared capacity as "*super parents*" over children.

65. Defendants Jeffrey D. Huffaker, Joyce Cram, and Edward G. Weil seem to view child duties as an irritant; more like a "*punishment assignment*". Said attitudes were very prevalent in the *disrespectful* manner in which Defendants treated Plaintiff and denied him to properly present his case.

66. In fact, Defendant the California Courts, through Defendants Jeffrey D. Huffaker, Joyce Cram, and Edward G. Weil, exceeded its traditional scope as an impartial institution of justice by promoting personal views, vague and abusive standards, and money goals to childrearing decisions. Judges have become active participants in domestic relations processes on the side of the state to expedite mass-produced support orders.

67. To insulate widespread misconduct from federal review and public scrutiny, judges abuse their powers under the guise of acting in the "best interests" of the child. Examples include Defendants Jeffrey D. Huffaker, Joyce Cram, Edward G. Weil and David B.Flinn's unlawful intrusion upon uncontested parenting agreements, threats against Plaintiff, incompetent invasions of child privacy, substitution of personal experience for the parents, vow of revenge from the bench during court processes, retaliatory disciplinary processes to preserve its fee generating "custodial institution", and complete aberration of judicial scope en route to coercing fraudulent support and custody orders and limiting Plaintiff access to his son. Defendants Jeffrey D. Huffaker, Joyce Cram, Edward G. Weil and David B. Flinn's orders were effective in limiting Plaintiff's parental rights and distinguishing his decision-making ability, and in contradiction of the court order giving Father 50/50 legal and physical custody.

68. All of the divorce and disciplinary decisions challenged here were made on the preponderance standard of evidence with a design to compel abandonment of court actions and constitutional rights under penalty of incarceration, stigmatization and threats. Under applied state laws, the Father was precluded all meaningful rights to confront witnesses exploited against him through discovery and notice deprivations. He was also denied a continuance when his legal counsel did not show up to trial.

### THIRD CAUSE OF ACTION

(Parental Privacy)

69. Through a scheme of federal and state child support laws, a "custodial institution of childrearing" has been erected to support government. As a condition for divorce or judicial relief involving child in every case, regardless of agreement, circumstance or proven fitness, parents are arbitrarily required to be named "custodial" and.or "non-custodial" parent.

70. A legal fiction of "continuing jurisdiction" is then applied uniquely to such cases having an ulterior goal of causing endless and recurring controversies, or products sold by attorneys for profit. The parents are *compelled by law to fight over their own child* in public court contests to secure and retain power (custody) and welfare (support) "awards".

71. This "custodial institution" operates further as a gender cleansing process by removing

traditional father and mother roles in favor of the statutory creations. "Custodial parents" are trained and exploited to place money over natural child interests. True parenting relationships are routinely destroyed with "custody" tactics and "civil" imprisonment.

72. In March 2008, the parents executed agreements for shared decision-making, child access was mutually flexible and the natural parties possessed promising futures. As soon as Defendant's Jeffrey D. Huffaker, Joyce Cram, and Edward G. Weil, became involved by invading the privacy of these parties; what resulted was a complete and irrevocable destruction of the former productive childrearing environment.

## FOURTH CAUSE OF ACTION

### (Distinct Right of Fatherhood)

73. The "custodial institution of childrearing", as practiced in this case and others similarly situated, impairing the capacity of half the parenting population to raise a child as natural Fathers. A scheme of gender-biased presumptions are applied in blanket fashion to "custody" and "support" processes to foreclose participants of this distinct liberty interest.

74. Most invasive are the arbitrary placements of the child with a single residential unit and the concomitant order of money payments from the other unit. These mandatory impositions operate on the *presumption that parents are incompetent* to arrange their own childrearing environments. Enforced at the outset of every case without hearing, they further operate to uniformly deprive Fathers of any meaningful relationships with their children.

75. Beginning shortly after the parties' separation in March of 2008, frustrations of the Plaintiff/Father's parental access began, including attempts to frustrate and terminate the Father's involvement in his son's life. These divorce tactics were sufficiently damaging and un-remedied to cause the Father to abandon meaningful efforts in the day-to-day participation in his son's life.

76. Other unique activities were similarly removed from the Plaintiff's child over time as these "custody" laws were applied. By virtue of his gender disability at birth, and state caregiver doctrines, the Father was systematically demoted to a non-parenting role as "*visitor*" in his child's life; subservient even to common babysitters in the allocation of priorities.

77. Defendant's Jeffrey D. Huffaker, Joyce Cram, and Edward G. Weil conspired to enter *standardized* orders against Plaintiff instead of orders more clearly written and suggested by Plaintiff; all to Plaintiff's detriment – as outlined in the, above-referenced, First Cause of Action.

## FIFTH CAUSE OF ACTION

### (Contracts Clause)

78. As part of their natural right and duty to raise children, parents rely upon infinite forms of agreement in joined or separated environments. This right is protected expressly under the Contracts Clause of the original Constitution and inherently under a privacy right fashioned from a penumbra of amendments ratified by the States thereafter.

79. The named Defendants have directly and/or indirectly impaired the obligations and consummation of numerous contracts over the last couple of years that were arranged by the parties most competent to decide the futures of their own infant child. Defendants have zealously protected their lucrative institution through additional acts of retaliation upon the exercise of this right since that time. Even when Plaintiff offered better and more clearly written orders.

## SIXTH CAUSE OF ACTION

### (Retaliation)

80. Defendants have directly and/or indirectly participated in acts of retaliation upon the father-attorney-litigant's exercise of protected rights in distinct capacities.

81. Among the acts cited elsewhere in this pleading, defendants Jeffrey D. Huffaker, Joyce Cram, David B. Flinn and Edward G. Weil maliciously ignored good faith settlement offers from Plaintiff and ignored more clearly written orders and harassed and threatened the Plaintiff/Father both on and off the record.

82. Defendants Jeffrey D. Huffaker, Joyce Cram, Edward G. Weil, David B Flinn, The State of California, City of Martinez, County of Contra Costa The CA court system, and Mother asserted false, frivolous and damaging petitions to coerce improper payments, job support and paternal abandonment in retaliation for the Father's professional and public statements seeking reform to their lucrative "custodial institution".

83. Defendants Jeffrey D. Huffaker, Joyce Cram, David B. Flinn and Edward G. Weil sponsored and published malicious comments on and off the record to disparage the

Father. Defendants manipulated processes in violation of due process, and scope of jurisdiction to protect other Defendants and their "custodial institution." Various acts of revenge were carried out to suppress the Father's exercise of fundamental rights at play throughout this pleading.

## SEVENTH CAUSE OF ACTION

### (Burden of Litigation)

84. The United States Supreme Court has announced a rule of constitutional law in **Troxel v Granville, 530 US 57, 75, 100-101 (2000)** which limits the conduct of domestic relations litigation when it reaches a point which unduly impairs childrearing decisions. That point was exceeded here as a result of Defendant's intransigence, placing an extraordinary burden upon Plaintiff as he was required to spend 1,000's of hours writing motions, preparing for hearings, trials, writing trial briefs, incurring costs for transcripts, court reporters, paper, printer ink, postage, many other fees and lose of his freedom and placed into servitude to the state. Plaintiff was placed in the unenviable position of *taking whatever the system shoved at him* in violation of his rights, or, fight for his rights.

85. Since Plaintiff's separation from the Defendant, orders and judgments have been entered in diverse proceedings emanated from an order entered in 2009. Under California law, these entries implicated substantial costs, each one carrying filing fees, transcript costs and other fees that collectively burdened the parents well beyond mainstream capacities.

86. Plaintiff was particularly burdened through one-sided support payments maliciously diverted from the child to finance the other side of escalating controversies and by denied fair and unhindered access to his son, Lucas. Through disciplinary retaliations, intransigence and *plain* incompetence, Defendants were able to manipulate the custodial institution to harm the Father and preclude him from his constitutionally protected parental rights.

## EIGHTH CAUSE OF ACTION

### (Petition for Redress)

87. Defendants have individually or collectively impaired the Father's rights under the last clause of the First Amendment to the United States Constitution. Such impairment has been affected by retaliation upon domestic relations filings, public criticisms, and in

further impairment of the Father's protected interests in seeking relief on other complaints and actions.

88. As a consequence of professional time critically diverted from the Father's employment in order to protect his child from seizure by the state, court motions were necessitated to hold persons accountable; all at great cost, reduced earning capacity and threats from the court.

89. Since 2008, Defendants and related parties acted upon and knowingly fabricated statements to stigmatize the Father as a sub-standard parent; notwithstanding the lack of evidence, probable cause or civil finding. This produced a suppression of the Fathers access to the court and denial and/or frustration of his parental rights and access to his son.

## NINTH CAUSE OF ACTION

### (Inverse Taking)

90. The collective actions of Defendants have amounted to an inverse taking of child and parent-child relationship without due process or just compensation in violation of the Fifth Amendment to the United States Constitution. The state's "custodial institution" features a current level of "over-regulation" which permanently and irrevocably transforms natural parent child relations into an alien and dysfunctional form of public childrearing.

## TENTH CAUSE OF ACTION

### (Cruel and Unusual Punishment)

91. To support the state's "custodial institution" and fraudulent money collection schemes, the Defendants have sponsored or promoted domestic incident reporting and debtor prisons in violation of the Eighth Amendment to the United States Constitution.

92. Defendants' imposition of a permanent stigma upon the Father for his *purported* excessive actions to protect his rights in court were a further violation of his rights. His requirement to take a mental evaluation, to be at the *whim* of the *custodial agent* regarding the residential sharing of his son and being subjected to *ridicule* and *threats* by Defendants, Jeffrey D. Huffaker, Joyce Cram, and Edward G. Weil, and the Mother, on numerous occasions, without a hearing and the indefinite suspension or frustration of his parental rights were tantamount to psychological torture and protracted processes.

93. The record will prove that Defendants Jeffrey D. Huffaker, Joyce Cram, David B. Flinn and Edward G. Weil *regularly threatened* Plaintiff or made inappropriate comments to intimidate, as well as, frustrated Plaintiff's access to the court for attempting to protect his parental rights. Plaintiff had extreme difficulty setting up a hearing, was refused access to the court process, was not allowed to speak nor present his case on numerous occasions and was *bullied* and intimidated; all conduct unbecoming a judicial officer and notwithstanding the *illegality* of said actions. Defendants Jeffrey D. Huffaker, Joyce Cram, and Edward G. Weil refused to hear Plaintiff's motions for holiday visitation and mediation. The transcripts *do not* properly reflect the *venom* with which Plaintiff was treated.

## ELEVENTH CAUSE OF ACTION

(Sovereign Abuse)

94. The Defendant State of California has surrendered attributes of its reserved sovereignty to the limited powers of the federal government under **Title IV-D** of the Social Security Act in violation of the Tenth Amendment to the United States Constitution. Among other things, it has subjected its courts to Federal laws that remove judicial discretion over support arrearages in order to receive entitlement monies for its budgets. The People have been further deprived of their rights under the State Constitution to be governed by the states as states of the union.

## TWELFTH CAUSE OF ACTION

(Equal Protection)

95. California law has imposed an inordinate burden upon the male parenting population in the allocation of rights and responsibilities in domestic relations litigation. Census Bureau statistics continue to report that 85% of parents paying "child support" are men whereas 80 to 90% of women engaged in contested cases receive "custody" awards.

96. By reason of his gender disability at the time when the parents agreed to separate, the Father could not overcome arbitrary caregiver presumptions. Accordingly he was institutionalized to a condition of *"Peonage"* and servitude in favor of the State's "custodial parent" for the balance of his useful life.

97. The discrimination cited throughout these pleadings violated the Fourteenth Amendment to the United States Constitution. Examples are found in the actions and inactions of all

Defendants in their failure to accord any child value to the father's home as a location for maintaining a distinct family unit.

## THIRTEENTH CAUSE OF ACTION

### (Declaratory/Injunctive Relief)

98. Plaintiff seeks specific relief under **28 U.S.C. Sections 1361, 2201 and 2202** declaring unconstitutional the above described processes and an order permanently enjoining their continuation. Plaintiff further seeks an order declaring California Domestic Relations Law unconstitutional on their face and as applied to this case. The Father particularly seeks an order restoring full parenting privileges that existed prior to State intervention, reversal of parenting periods, with make-up time and relief to correct longstanding discrimination.

99. To the extent that greater protections are afforded among parallel provisions enumerated in the California Constitution, Plaintiff seeks a similar declaration under state law. Plaintiff claims violations of the California Bill of Rights.

## FOURTEENTH CAUSE OF ACTION

### (State Law Abuse of Process and Emotional Distress)

100.    Defendants and unknown others have individually and collectively engaged in a malicious process for filing false claims and inducing extreme emotional distress upon the plaintiff father.

101.    Additionally, Defendants and unknown others directed, assisted or participated in acts of psychological torture by effectively seizing and exploiting the father's child; keeping the child from Plaintiff.

102.    Defendants willfully and maliciously subpoenaed Plaintiff for pay-stubs, emails, and documentation from Plaintiffs that were already provided to Defendants. Defendant's actions were to *purposely* cause problems for Plaintiff, to punish Plaintiff and to create extreme emotional distress upon Plaintiff. Defendant's actions were *retaliatory* rather than based in fact.

## FIFTHTEENTH CAUSE OF ACTION

### (State Law Breach of Contract)

103.    Defendants have breached their agreement or tortiously interfered with the party parents' childrearing agreements. The parents had agreements between them about the rearing of their son prior to the interference by Defendant's. Said agreements were breached by Defendant Joyce Cram as it became apparent to her, with influence by other Defendant's, that she could use the State's agenda to get what she wants; complete control and money.

## SIXTEENTH CAUSE OF ACTION

### (State Law Defamation of Character)

104.    Certain named defendants have maliciously and recklessly published false and defamatory statements concerning the Plaintiff/Father to each other and to third parties in the community. Discovery is needed on this claim to flesh out the words, locations and dates.

WHEREFORE, Plaintiff respectfully request judgment in this action as follows:

1. An order restoring unimpaired child relationships and licensing privileges; and,

2. Compensatory damages of Two Million Dollars ($2,000,000.00); and,

3. Punitive damages in an amount to be determined by the Court; and,

4. Declaratory relief determining rights as between the parties together with a finding of unconstitutionality to the processes and provisions described in this pleading; and,

5. A permanent injunction prohibiting defendants from further violating Plaintiff's relationship with his son, Lucas; and,

6. An order reversing the parenting periods between the mother and father for a time frame equating the period since the plaintiff child entered compulsory primary care with the State's *custodial agent*; and

7. An order desegregating the Mother and Father as custodial and non-custodial parents of the state together with appropriate remedial provisions; and,

8. An order directing the Defendant State of California to study, evaluate and similarly desegregate the parenting population coming under their jurisdiction to rectify the ongoing historic imbalance between the genders in public childrearing practices; and

9.  An award of costs and fees and litigation costs, travel expenses pursuant to 42 U.S.C. Section 1988; and,

10. An order vacating Judge Joyce Crams sanctions order and return of all moneys with state statutory interest; and,

11. An order designating Daniel R. Pestana, D.D.S. Lucas's primary dentist, providing all of his dental care; and,

12. Such other relief as may be just and proper.

Dated: November 17, 2015

**Daniel R. Pestana Plaintiff** *Pro Per*
2255 Ygnacio Valley Road, Suite #J2
Walnut Creek, CA 94598
(925) 640-3615